### In the Matter of FOOD FAIR, INC., Debtor.

### Bankruptcy No. 78 B 1765.

United States Bankruptcy Court, S. D. New York.

March 19, 1981.

Stein, Simpson, Rosen & Ohrenstein, New York City, Sp. Counsel to debtor.

Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N. J., for RCPF.

Cunniff, Bray & McAleese, Bala Cynwyd, Pa., for claimants.

## MEMORANDUM & ORDER

JOHN J. GALGAY, Bankruptcy Judge.

Claimants, Warehouse Employees Union, Local 169, have initiated this action against Food Fair, Inc. for breach of contract. They allege that in connection with its participation in a multiemployer pension plan, Food Fair owes to the plan approximately $4,000,000, representing an unfunded liability for the pensions of former employees. Food Fair objects that it has no obligation to pay such sum either under the contract or the law, and has moved for summary judgment expunging the claim.

The Warehouse Employees Union, Local 169, Joint Pension Plan, (the Plan) in which Food Fair and other supermarkets in the Philadelphia area have participated as contributing employers, was established in 1959 pursuant to a collective bargaining agreement. This Plan has been carried forward in each succeeding agreement to the present. Under the terms of the original and subsequent agreements, Food Fair and the other participating employers of the Plan have been required to make contributions to the Plan measured in terms of a specified amount for each hour of straight time worked by an active covered employee. Section 23 and Schedule E–1 of the 1959 Collective Bargaining Agreement. Accordingly, the total yearly contribution of each employer has varied as the number of active employees has fluctuated.

In the process of curtailing its Philadelphia operations pursuant to a Chapter XI reorganization, Food Fair in early 1979 closed its Philadelphia warehouse and terminated numerous employees covered under the Plan. Food Fair proportionately reduced its current plan contribution (measured by active service of its remaining employee participants) and this initially caused a funding deficiency. In the next collective bargaining agreement the contribution rate was increased, partially to cure that funding deficiency and maintain the funding standards mandated by E.R.I.S.A. Food Fair has remained party to the collective bargaining agreement and the Plan and has continued to make contributions measured by the service hours of active employees at its continuing facilities. The burden of supporting the Plan has however shifted substantially to the other participating employers.

It is Food Fair's position that under the clear terms of three documents setting out the structure of the Plan, the contributions measured by the service hours of active employees constitute its sole funding obligation to the Plan. The Union has brought this suit alleging that Food Fair's curtailment of contributions and refusal to pay for all present and future Plan costs attributable to Food Fair's former employees have imposed an unfunded liability on the Plan and threatened to deprive all participating employees of their full vested retirement benefits. The Union also claims that since future periodic contributions of remaining employers will have to be used to amortize the deficit caused by Food Fair's reduction in contributions, benefit increases which the retirees would otherwise have gained will be foreclosed.

The Union anchors Food Fair's liability for these prospective losses on a breach of contract theory. In its Statement pursuant to Local Rule 9(g), the Union sets out that Food Fair collaterally and implicitly promised to pay the ultimate pension benefits of its employees. In support of its claim the Union also insists that the entirety of the relationship between Food Fair, its employees, the Union and the Plan cannot be determined by exclusive reference to the Plan documents. The Union thus wishes to adduce testimony at trial concerning bargaining history to demonstrate the promise of Food Fair to pay its employees' share of the entire cost of the Plan.

Food Fair moves for summary judgment claiming that the Plan documents subsume the entire agreement between the parties and that those documents disclaim any lia-

bility of the employers in excess of the contributions measured by the active service of employees. Food Fair also argues that the Union has presented no evidence in support of its claim, nor even demonstrated any injury sufficient to create a triable issue of fact.

## I

■ In the hearing before this Court on August 26, 1980, the Union suggested that aspects of the recently enacted Multiemployer Pension Plan Amendments to E.R.I.S.A. might through retroactive effectiveness provisions impose liability on Food Fair for a partial withdrawal from the Pension Plan. *See* Transcript, pp. 42–43. This Court finds that a decrease in contributions due to an employer's cessation of substantially all of its operations at one or more facilities, if occurring before April 29, 1980, is not to be taken into account to determine whether a partial withdrawal under the Act has taken place.

Section 4205 of the Multiemployer Pension Plan Amendments generally imposes liability for partial withdrawal on an employer if there is either a 70% contribution decline under subsection (a)(1), or a partial cessation of the employer's contribution obligation under subsection (a)(2). Relevantly, the latter can occur when "an employer permanently ceases to have an obligation to contribute under a plan with respect to work performed at one or more but fewer than all facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceases". Subsection 2(A)(ii).

■ Although either of these definitions of a partial withdrawal might appear applicable to the circumstances in the case at bar, section 108 concerning transition rules and effective dates of the amendments provides that for purposes of section 4205, subsection (a)(1) shall not apply to any plan year beginning before April 29, 1982 and that subsection (a)(2) shall not apply to any cessation of contribution obligations occurring before April 29, 1980. An explicit explanation of the effect of the transition rules of section 108 is set out in the Senate Labor and Finance Committee Joint Explanation of S 1076 (July 24, 1980):

> The bill provides a special rule which prevents certain events which occurred before April 29, 1980 from triggering withdrawals and from increasing the liability for a partial withdrawal, on or after that date. Under the bill, for the purpose of determining withdrawal liability for a complete or a partial withdrawal after April 2[9], 1980 and for the purpose of determining whether a partial withdrawal has occurred after that date, the amount of contributions and the number of contribution base units of the affected employer which are properly allocable to . . . work performed at a facility for which there was a cessation of contributions before April 29, 1980, are not to be taken into account.

*Id.* at 98. As Food Fair closed its Philadelphia warehouse and correspondingly reduced its contributions in January of 1979, section 4205 concerning liability for partial withdrawals does not create any liability on Food Fair's part under the new amendments.

Other than through the new amendments, E.R.I.S.A. imposes no obligation on employers to pay benefits, except in the event of plan termination, 29 U.S.C. § 1364, or employer withdrawal, 29 U.S.C. § 1363. Neither of these events has taken place in this case.

## II

In support of its claim of a promise by Food Fair to pay its employees their ultimate pension benefits, the Union has said it would adduce testimony at an evidentiary hearing with regard to certain conversations at the collective bargaining table demonstrating such a promise. This Court has decided not to take testimony on grounds of the Union's failure to identify or prove the existence of any such evidence.

■ In response to Food Fair's interrogatories requesting the basis of its assertions of liability, the claimants admitted to

having "no present recollection of any oral communication that has a bearing on the claim". Claimants' Response to Interrogatories No. 4. Subsequently, in a hearing before this Court, the Union claimed it had received negotiation notes and documents from Food Fair's files which might indicate the existence of such evidence. Transcript, p. 46. The Union has since that time neither advised Food Fair of a change in its answers to the interrogatories nor provided specific identification of relevant conversations. This Court is reluctant to allow the Union to avoid a summary judgment on its representations of evidence it has not demonstrated that it possesses. As the district court noted in *Berry Bros. Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542 (E.D. Pa.1966), *aff'd* 377 F.2d 552 (3rd Cir. 1967), in opposing a motion for summary judgment, a party

> cannot withhold his evidence until the date of trial but must show by some admissible evidence that there is a genuine issue as to a material fact.

*Id.* at 545. Plaintiff has not met that burden.

■ Moreover, the evidence that the Union wishes to present at trial would be inadmissible under the parol evidence rule. The documents which embody the provisions of the pension plan are facially clear and unambiguous; they also evidence an intent to constitute the entire agreement of the parties concerning the operation and funding of the Pension Plan. Those documents are the Collective Bargaining Agreement, the Trust Agreement and the Pension Plan. Schedule E–1 of the Collective Bargaining Agreement of 1959 sets forth a single contribution formula for each contributing employer based on the number of hours worked by each active employee. The Trust Agreement, created pursuant to the Plan and Collective Bargaining Agreement to establish a fund to receive contributions of the employers and from which benefits to participants are paid, provides that,

> ... the entire obligation of the Member Companies hereunder shall be limited

to the payment of such monies as provided in their respective collective bargaining agreements with the Union. The Member Companies shall not be obligated to make any other payments to Participants for pensions, or into the Pension Fund or to make up any deficiencies resulting from any condition.

Section 8.01 of the Trust Agreement. Similarly, the Pension Plan itself, a document setting the benefits for employee participants, states that,

> Except as provided by the Employee Retirement Income Security Act of 1974, the entire financial obligation of a Member Company, the Union and its Credited Union under the Plan shall be limited to the payment of Contributions as defined in Section 1.12 of the Plan.

Article X, § 10.5 of the Pension Plan. Section 1.12 of the Plan defines "contributions" as sums required and paid into the Pension Fund by the Member Companies pursuant to their collective bargaining agreements with the Union. Both the Trust Agreement and the Pension Plan relate back to the original Collective Bargaining Agreement and expressly absolve employers of any liability other than the obligation to pay the negotiated contributions measured in active service hours as set forth in the Collective Bargaining Agreements.

■ "Under the Parol Evidence Rule, when parties to a contract have reduced their agreement to a written form and this writing appears on its face to be the entire agreement of the parties, evidence of prior or contemporaneous negotiations or agreements, which either vary or contradict that writing, is inadmissible." *United States Gypsum Co. v. Schiavo Bros., Inc.*, 450 F.Supp. 1291, 1302 (E.D.Pa.1978). In the case of collective bargaining agreements as well, parol evidence is inadmissible for the purpose of interpreting terms that are facially clear and unambiguous. *Manning v. Wiscombe*, 498 F.2d 1311 (10th Cir. 1974). Decisions cited by claimants to show that parol evidence has been allowed for the purpose of interpreting the terms of collective bargaining agreements are inapposite.

In none of the cases was the bargaining history leading up to a labor agreement brought forth to interpret or vary an agreement so patently unambiguous as the one in the case at bar.

### III

■ The Union's theory for its breach of contract claim is the same as one put forward by the Retail Clerks Tri-State Pension Fund in an earlier suit against Food Fair in this Court. *See In the Matter of Food Fair, Inc., Retail Clerks Tri State Pension Fund,* 78 B 1764 (Sept. 16, 1980), *aff'd* No. 80–6459 (S.D.N.Y., Mar. 13, 1981). As in that case, the claimants allege that Food Fair has an obligation, derived from an implicit promise, to pay into the Pension Fund the cost of the Plan attributable to its employees. This Court holds that claimants in this case, as in the former, have presented no triable issue of fact sufficient to support their claim.

The Union attempts to factually support its claim on provisions in Plan documents setting forth levels of pension benefits to be paid to participating employees, and on the inherent requirements and understandings of the parties concerning the nature of the process for generating the necessary funds. The Union argues that since the contribution levels of the employers are derived from actuarial calculations based on those benefit levels, it is implicit in the assumptions behind the funding mechanism that each employer provide the funds necessary to the benefits of its employees.

This theory finds no support in the case law concerning multiemployer pension plans. In fact, the case law expressly indicates that Food Fair has no obligation to contribute to a Pension Plan of this kind any more than the specified amount set out in the bargaining agreements.

In *Connolly v. Pension Benefit Guaranty Corporation,* 581 F.2d 729 (9th Cir. 1978), *cert. den.* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979), the Ninth Circuit interpreted a similar multiemployer pension plan which provided for employer contributions to be determined by multiplying the employees' hours of service by a rate specified in the current agreement. The court held that "the employer's sole obligation to the pension fund is to pay such contributions as required by the collective bargaining agreements," *id.* at 731, even though contributions sufficient to pay its employees' benefits had not been made on their behalf.

The clear language of the documents creating and supporting the Pension Plan affirm that it is the Plan as a whole which has the obligation to pay vested pension benefits, not the particular employers. The documents contain clauses explicitly limiting the obligation of each employer to contributions stipulated in the collective bargaining agreement. As Food Fair points out, in a recent collective bargaining agreement, participating employers agreed to increase their contributions to the Plan to prevent any shortfall to the beneficiaries. Claimants thus have not proved any deprivation in fact, or even threatened deprivation, of vested pension benefits as a result of Food Fair's action.

■ Food Fair has made all of its required payments under the Plan. Its required contributions toward the vested benefits of its former employees were made in the years those individuals worked for Food Fair. Food Fair thus has no further obligation to the Pension Fund in their behalf.

### IV

In conclusion, this Court finds that claimants have presented no triable issue of fact sufficient to support their claim. This Court declines the Union's request to present bargaining history in an attempt to vary the terms of an agreement which explicitly limits Food Fair's liability, and grants Food Fair's motion for summary judgment expunging the claim.

It is so ordered.