**FORD-MOTOR CO. v. DEXTER et al.**

**No. 258.**

Circuit Court of Appeals, Second Circuit.

March 14, 1932.

CHASE, Circuit Judge, dissenting in part.

Root, Clark & Buckner, of New York City (Emory R. Buckner and Cloyd Laporte, both of New York City, of counsel), for appellants.

Greene & Hurd, of New York City (Richard T. Greene, Daniel S. Murphy, James L. Dohr, and Edward E. Weadock, all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

In the autumn of 1922 the plaintiff negotiated with the defendants for the purchase of a coal mine. The transaction agreed upon took the form of a transfer by the defendants to the plaintiff of the entire capital stock of Dexcar Pocahontas Coal Company. Several years later deficiencies in federal income and excess profits taxes were as-

sessed against said coal company for the years 1920 and 1921. The deficiencies were finally determined in 1926 and 1927, respectively, in the amounts, including interest, of $37,088.81 for the year 1920, and $129,583.05 for the year 1921. These sums the plaintiff paid to the United States and sought to recover from the defendants by the present suit, which is grounded upon the premise that the sellers of the coal company's stock agreed to hold the buyer harmless against these corporate liabilities.

The contract between the parties was closed on November 1, 1922, and was embodied in a written agreement of that date. It is obvious that a purchaser of corporate stock takes the risk of all outstanding corporate liabilities, except in so far as the contract of purchase may provide otherwise. The provisions of the agreement of November 1, 1922, were very carefully limited in this regard; the defendants agreed to hold the plaintiff harmless against the following described liabilities only: " * * * Any claim presented against the Dexcar Pocahontas Coal Company within six months from November 1st, 1922, for any liabilities arising because of mine accidents, torts, or contracts which do not appear on the books of said Company on October 31st, 1922, and which are not for current merchandise, supplies and labor; and except contract and sales set forth on Exhibit B hereto attached."

Hence it is apparent that, were the rights and obligations of the parties to be determined under this contract alone, the risk of any correction in assessments for corporate taxes for the years 1920 and 1921 would have to be borne by the plaintiff, for the defendants had warranted nothing as to tax liabilities even if the claims were presented within six months. But on November 2, 1922, the parties made a supplemental agreement evidenced by the following letter:

"New York City, November 2nd, 1922.
"Ford Motor Company, Detroit, Mich.

"Gentlemen: Attention: Mr. W. B. Mayo. It is understood between us that the price is $1,250,000.00 for our physical assets and leaseholds at Twin Branch, West Virginia, that we are to assume the payment of the outstanding bonds amounting to $40,000.00, which amount we will deduct from your price of $1,250,000.00 and you assume the payment thereof, leaving a net balance of $1,210,000.00.

"The inventory of supplies and store merchandise has been fixed at $90,000.00, which, added to the $1,210,000.00, makes a total of $1,300,000.00 for all the physical assets and leaseholds and the store and mine supplies; the Ford Motor Company to pay the bonds.

"In addition to the above, the net current assets, as of October 31st, 1922, were fixed at $100,000.00, which, added to the amount of $1,300,000.00, makes a sum of $1,400,000.00, and it is understood and agreed that if the net current assets do not equal $100,000.00, as shown on attached statement, we are to refund to you any such difference, and in the event of the net current assets totaling more than $100,000.00 shown the Ford Motor Company will pay to us such difference.

"Attached hereto is a balance sheet as of October 1st, 1922, which we believe to be substantially correct.
"Yours very truly,
"G. M. Dexter,
"W. H. Carpenter,
"Ford Motor Company,
W. B. Mayo."

The warranty regarding "net current assets," which is contained in the next to the last paragraph of this letter, constitutes the contract upon which the plaintiff framed its complaint. The first count charged that without reference to the additional taxes the net current assets on October 31, 1922, amounted only to $28,698.46. This cause of action has been settled, and need not be further considered. The second and third counts relate to the additional tax assessments for 1920 and 1921, respectively, and the correctness of the judgment entered for the plaintiff on these counts turns solely on the construction to be given the phrase "net current assets" as used in the above-quoted letter.

In determining the meaning of a written document it is permissible to ascertain the circumstances under which the parties have used the words chosen by them to express their agreement. Merriam v. United States, 107 U. S. 437, 441, 2 S. Ct. 536, 27 L. Ed. 531. The testimony of Mr. Dexter and Mr. Carpenter explains how this letter came to be written. The gentlemen who had represented the plaintiff in executing the contract of November 1st returned to the defendants' office the next day and wanted a memorandum to show Mr. Ford how the price had been arrived at. Thereupon Mr. Dexter dictated this letter, allocating to "physical assets and leaseholds," $1,250,000, less $40,000 of bonds outstanding against the property; to "inventory of supplies and

store merchandise," $90,000; and to "net current assets" as of October 31, 1922, $100,000—a total price of $1,400,000. The parties had before them the balance sheet of October 1st, and a question was raised whether the balance sheet of a month later would show as much. The sellers agreed that the "net current assets" would be not less than $100,000, and in return got the buyer's promise to pay the excess if they were more.

■ It will be observed that the letter refers to an "attached statement" and to an attached "balance sheet as of October 1st 1922." The statement is headed, and reads, in part, as follows:

List of Assets (shown on attached Balance Sheet) to be Turned over in Proposed Sale.

Based on Balance Sheet as of October First 1922.

Inventory of store merchandise
(est.) ...................... $54,119.02
Inventory of Mine Supplies
(Book Inven.).............. 46,463.05
 _____
 $100,582.07
Sold for..................... 90,000.00
Net Current Assets (Tentatively
Est.) ......................$100,000.00

Then follows "Plant & Equipment (At Cost)," $1,023,319.11, and "leaseholds," $428,413.00, with a notation that reserves for depreciation are shown on the books at $324,244.54. Subtracting the reserves would leave a net worth of $1,127,487.57 for what the letter of November 2d calls "physical assets and leaseholds" and values at $1,250,000. Apparently the parties considered the book depreciation excessive, just as conversely they considered the "inventory of supplies and store merchandise" overvalued and discounted it by about 10 per cent.

When we turn to the balance sheet on which the "statement" was "based," we find under the heading "Assets" the same figures for "plant and equipment," and the same figures for "inventory of store merchandise" and "inventory of mine supplies." There is nothing, however, which corresponds very closely to the tentative estimate of $100,000 for "net current assets." There is an entry of "Total Current Assets," $224,890.19. This is made up of cash in banks, accounts receivable, and inventories, the latter including the aforesaid items of "store merchandise" and "mine supplies." The obvious implication of "net current assets" is that something is to be subtracted from "total current assets." Whether or not anything else is to be subtracted, clearly the items of "store merchandise" and "mine supplies" must be, for in the "statement" of "assets to be turned over" these two items are classified in a separate category, independently valued. Subtracting these two items leaves the remaining current assets at $124,308.12, which is only about 20 per cent. more than the tentative estimate of "net current assets" mentioned in the statement. This is a figure which the parties might reasonably have had in mind and have referred to as "net current assets," since it was "net" after making a subtraction from "total current assets."

If, however, we take the view that in addition there must be subtracted the items appearing on the balance sheet as "total current liabilities," the sum remaining would be only $35,879.44. Since the parties had discounted all other assets (counting the depreciation of plant and leaseholds as a discount), it does not seem likely that they meant to increase by nearly $65,000 the property which they termed "net current assets." It is more consistent to suppose that they would discount that also, as they would if it referred to the balance of $124,308.12 remaining after deducting the "mine supplies" and "store merchandise." Moreover, the parties themselves did not read the balance sheet of October 1st as showing "net current assets" of less than $100,000. This is shown by the testimony of Mr. Carpenter and Mr. Dexter concerning the conversation which led up to the drafting of the letter. Mr. Carpenter testified as follows:

"We had the balance sheet of October 1st before us, and this was a month later. And Mr. Lunsford said 'Well, suppose it is less than *that*' [italics ours]. Mr. Dexter replied, 'Well, suppose it is more.' * * *

"Q. That is the current assets? A. That is the current assets; yes, sir."

This is corroborated by Mr. Dexter's testimony:

" * * * And we gave him at that time this balance sheet which is attached to this.

"Q. October 1st? A. That was dated October 1st. Well, Mr. Lunsford said, 'Suppose the net current assets have changed since then, between October 1st and November 1st. I told him that there was no reason why they should, that we had had a very busy month. * * *"

This testimony is wholly inconsistent with the theory that "net current assets" on the October 1st balance sheet were only $35,-

879.44. Furthermore, the "statement" which purported to list the "assets" which the coal company was to possess on October 31st contained no reference whatever to corporate liabilities. In the letter as well as in the "statement" the corporation's property was divided into three categories and each given a separate valuation. In our opinion "net current assets" referred to all assets other than those included in the categories of (1) plant and equipment (including leaseholds), and (2) mine supplies and store merchandise, and had no reference to current liabilities. In other words, we think the parties meant that the cash in bank, accounts receivable, and unbilled coal (listed among "total current assets" in a balance sheet made up in the same way as that of October 1st and brought down to cover October 31st), would equal $100,000. The sellers warranted that they would, and the buyer agreed to pay the excess if they were more, leaving the agreement as to corporate liabilities just as it was expressed in the contract of November 1st.

It is true, as the plaintiff argues, that the phrase "net current assets" usually means the difference between total current assets and total current liabilities. Obviously, however, the parties did not use it in exactly that sense, for they clearly contemplated the exclusion of part of the property which appeared in current assets, namely, the inventories of store merchandise and mine supplies. Even were we to assume, contrary to the preceding argument, that "net current assets" were to be determined by deducting from "total current assets" not only the inventories of store merchandise and mine supplies, but also the "total current liabilities," the plaintiff would fare no better unless the sellers' warranty be construed as guaranteeing not what the books would show as "net current assets" as of October 31st, but that such assets would have an actual value of $100,000. We cannot so construe it. As the conversation above quoted clearly indicates, the minds of the parties were directed to what the "net current assets" would show if the balance sheet of October 1st were brought down to cover the month of October. They were drawing up a memorandum to explain how the price (which was to be paid "on or before the 15th day of November, 1922") had been arrived at, and they made a supplemental agreement to adjust the stated price of $1,400,000, if the "net current assets" "tentatively estimated" on the "basis" of the October 1st balance sheet should have changed during the month of October. In the light of these circumstances, and their prior agreement of November 1st, the letter must be read. To construe it as a warranty of the correctness of all current liabilities shown on the books as of October 31st, and as contemplating a rectification of those entries at remote future dates is not required by its language and would certainly run counter to the theory of the transaction as embodied in the formal contract of November 1st. As already pointed out, when the purchase of the stock was agreed upon, no general warranty of corporate liabilities was exacted from the sellers. On the contrary, they agreed to pay only certain liabilities which did not appear on the books, and those only if presented within six months. It cannot reasonably be supposed that by the subsequent letter written under the circumstances disclosed, the parties intended to depart so fundamentally from the arrangement formally agreed upon the day before as to provide that the sellers should guarantee the accuracy of all current liabilities shown on the books and that none was omitted which should have appeared. The letter says not a word about indemnifying the buyer against liabilities (the language used when they were dealing with this subject in the contract of November 1st). It says only that the sellers agreed "if the net current assets do not equal $100,-000.00 as shown on attached statement [which contains a "tentative estimate" "based" on the balance sheet of October 1st] we are to refund to you any such difference." We can read this only as referring to book "assets," not as warranting actual values; they assumed nothing whatever as to liabilities except as they had already done so in their formal contract. So whichever interpretation of the two above discussed be ascribed to "net current assets," the sellers gave no promise to hold the plaintiff harmless against the tax liabilities in question.

Accordingly the defendants' motion for a directed verdict on counts 2 and 3 should have been granted rather than the plaintiff's.

Judgment reversed, and cause remanded.

CHASE, Circuit Judge (dissenting in part).

While I agree that the judgment in this case should be reversed, I do not agree that the error which requires reversal goes to the plaintiff's cause of action under its second and third counts. It goes only to the amount of damages recoverable.

The parties signed their written contract November 1st. That contract is plain. It

has been wholly performed. It now is of no consequence except to aid as a part of the background in determining what the supplemental agreement of November 2d means. In this supplemental agreement, which is really nothing but a tabulation, except in respect to the item called "net current assets," the parties divided into classes the assets behind the stock the plaintiff purchased and allotted to each class a value. The sum of these values equaled the agreed purchase price of the stock. Clearly, as a tabulation, it made little difference then whether the values assigned were accurate or not, for the trade had already been made and the price to be paid agreed upon. Except as to something which they chose to call net current assets, what the plaintiff would get was certain enough, and what values were assigned in the supplemental agreement to those certain things merely gave Mr. Ford the opportunity to see on paper, at least, why his representatives had·made the purchase at the price to which they had agreed. So far there was no supplemental agreement.

But, as to the $100,000 which had been allotted to what was called net current assets, the writing of November 2d went to the dignity of a supplemental agreement. It is now impossible, as the opinion of the majority shows, to determine exactly what the parties meant by net current assets. My brothers have pointed out what may have been meant and how the parties may have figured and discounted to their agreement. I do not think that is now important. Perhaps they added the values allotted to the other items, subtracted the total from the purchase price, and found that $100,000 was left to be accounted for. What really matters is that they agreed that, in addition to all other assets behind the stock bought, there should be what they called "net current assets," and the defendants agreed that they should be worth at least $100,000. The plaintiff promised to pay the excess value if they turned out to be worth more, and the defendants promised to refund the difference if they were worth less. The parties spoke in terms of value in money rather than in quantity and kind. The defendants promised, not to pay an unlimited amount to make this value the equivalent of $100,000, although the plaintiff promised to pay in full for any over run in value, but to refund the difference; that is, having treated this item separately and warranted its value, the defendants agreed to refund, but to the extent of that warranted value only, so much as would be necessary to give the plaintiff $100,000 in value in net current assets behind the stock in addition to the other items enumerated but not value warranted. Having spoken in terms of value, these parties should now be taken to have meant what the words they chose to use normally mean when applied to money values and held to have meant what they said. Accordingly, net current assets should be held to mean the net value of the current assets after current liabilities have been deducted rather than the amount, merely as a book entry, of something called current assets after some other assets have been segregated. As the current tax liabilities, as of the time of the purchase, more than offset the value of the current assets, the $100,000 which the plaintiff paid for net current assets was paid for something which did not exist. It is entitled, therefore, to judgment on the causes of action alleged in the second and third counts; but only to such damages as will make its recovery under all counts equal to the agreed refund of $100,000.