In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2698, 99-2539 & 99-2629

Central States, Southeast and Southwest Areas
Pension Fund and Howard McDougall, Trustee,

Plaintiffs-Appellees/Cross-Appellants,

v.

Nitehawk Express, Inc., Six Transfer, Inc.,
Interstate Express, Inc., Midwest Jobbers
Terminals, Inc. and James LaCasse,

Defendants-Appellants/Cross-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 95 C 3944 and 97 C 1402--John A. Nordberg, Judge.

Argued February 8, 2000--Decided August 4, 2000

Before Cudahy, Manion and Diane P. Wood, Circuit
Judges.

Cudahy, Circuit Judge.

I) Background

In some industries, particularly those where
jobs are "episodic," individual companies do not
sponsor pension plans. See Langbein & Wolk, Pension and
Employee Benefit Law 57 (2d ed.). Instead, groups of
firms in an industry make pension contributions
to a joint, or multiemployer, pension plan. See
id. In 1980, Congress passed the Multiemployer
Pension Plan Amendments Act of 1980 (MPPAA). See
29 U.S.C. sec.sec. 1381-1461. The MPPAA was
prompted by Congress's fear that as individual
employers withdrew from joint plans without
providing funds to cover their workers' accrued
benefits, a plan could be underfunded by the time
the workers retired and their benefits came due.
See Central States, Southeast and Southwest Areas
Pension Fund and Howard McDougall v. Hunt Truck
Lines, Inc., 204 F.3d 736 (7th Cir. 2000). To
avoid the development of this scenario, Congress
provided that when an employer withdraws from a
multiemployer plan, it must pay "withdrawal
liability" in an amount roughly equal to its
proportionate share of the plan's unfunded vested

benefits. Thus, withdrawal liability essentially forces employers to continue making payments on behalf of fully vested workers so that, even though the company is no longer a going concern, its fully vested workers will receive the benefits they earned there. The employer's "contribution history," or the level of contributions it has made on behalf of workers over a fixed period of time, provides a substantial element in the calculation of withdrawal liability. Generally, a higher contribution history indicates a higher proportionate participation in a plan, but it is not unusual in a plan where each employer sets a different benefit level that some employers may be paying too little for their promised benefits while others pay too much. Therefore, until a pension fund calculates how much a withdrawing employer would have to invest in order to pay at the promised benefit level, it is hard to say whether a higher contribution history necessarily correlates with a higher withdrawal liability.

James LaCasse was the 100 percent shareholder of three companies known as Hines Transfer, Inc. (Hines), Six Transfer Co. (Transfer) and Nitehawk Express, Inc. (Nitehawk). The three are considered to be a "controlled group," and are treated as a single employer. See 29 U.S.C. sec. 1301(b)(1). We refer to the three as the LaCasse controlled group. Transfer had eighteen workers; Nitehawk had four. All three companies had entered into collective bargaining agreements with local affiliates of the International Brotherhood of Teamsters. Under the agreements, the companies were to make pension payments on behalf of their workers to the Central States, Southeast and Southwest Areas Pension Fund (Central States), which is a multiemployer pension plan under ERISA. See 29 U.S.C. sec.sec. 1002(37) and 1301(a)(3).

Hines Transfer shut down in 1986, and it was freed from its obligation to make contributions to Central States. Central States did not assess withdrawal liability because the LaCasse group's contributions to the Fund did not decline more than 70 percent over the preceding three-year period as a result of the Hines shutdown. See 29 U.S.C. sec. 1385. In September 1992, Transfer sold its assets to Six Cartage (Cartage). The MPPAA exempts some sales of assets from withdrawal liability, if the buyers and sellers structure the sale appropriately and comply with certain reporting and bonding requirements. Once the purchase agreement was complete, Transfer notified Central States of the sale, but claimed an exemption. Critically, Transfer did not comply with all of the technical requirements set out in the statute's exemption provision. Central States

did not assess withdrawal liability against Six Transfer at that time. In any event, Cartage continued making payments on behalf of former Transfer employees. A year later, Nitehawk shut down. Central States then determined that the controlled group had completely withdrawn from Central States, and therefore owed withdrawal liability in the amount of $456,620. The controlled group initiated arbitration, while Central States exercised its statutory prerogative to sue for so-called interim withdrawal liability payments. See 29 U.S.C. sec. 1399(c)(2). In 1996, the district court--properly deferring consideration of the underlying case-- granted summary judgment on the interim payment issue for Central States, and ordered the controlled group to pay $456,620 plus liquidated damages and attorney's fees.

In 1997, the arbitrator found that the LaCasse group owed no withdrawal liability because Transfer's sale of assets--which accounted for the lion's share of the group's reduced contribution to the Fund--was exempt from withdrawal liability under the MPPAA. See Appellant's App. at 24 (In the Matter of Arbitration Between Nitehawk Express and Six Transfer, Inc. and Central States, Southeast and Southwest Areas Pension Fund, AAA Case No. 51-621-00147-94 at 13-14) (hereinafter In the Matter of Nitehawk). Predictably, the LaCasse group moved to enforce the arbitration award and vacate the judgment ordering interim payment. The district court determined that, contrary to the arbitrator's view, Transfer had failed to meet the three conditions required to secure an exemption from withdrawal liability. Because the sale of assets was not exempt, the court determined, it constituted a partial withdrawal from the Fund. Although withdrawal liability was not proper so long as one member of the controlled group, Nitehawk, remained a going concern, as soon as Nitehawk shut its doors, the controlled group had to ante up. Therefore, the court granted partial summary judgment to Central States and ordered the LaCasse group to pay withdrawal liability. But it went on to hold that the group's liability should be calculated without reference to Transfer's contribution history because, in its view, Cartage had essentially adopted Transfer's contribution history, which meant the Fund had suffered no harm. See Central States et al. v. Nitehawk Express, Inc. et al., No. 97 C 1402 (N.D Ill. March 23, 1999) (hereinafter "Mem. Op.") at 15-16. The LaCasse group appeals the award of withdrawal liability, and Central States cross-appeals the district court's decision to allocate Transfer's contribution history to Cartage, as well as its refusal to award attorney's fees in

connection with Central States' victory in the interim payments case./1

II) Analysis

A) Background of the MPPAA

The MPPAA requires that a company choosing to withdraw from a multiemployer pension plan must pay "withdrawal liability," which is intended to cover that company's share of the unfunded vested benefits that exist when it withdraws. See 29 U.S.C. sec.sec. 1381, 1391. Congress permits multiemployer pension plans many options for calculating withdrawal liability, all of which are intended to assure that departing employers bear their fair share of pension payments, and do not leave others holding the bag. Most of the methods endorsed by Congress calculate withdrawal liability "as a function of contributions made by the withdrawing employer, normally for the five [or ten] plan years ending with the year in which the unfunded vested benefits or change in the unfunded vested benefits is determined." Ronald A. Kladder, Asset Sales After MPPAA--An Analysis of ERISA Section 4204, 39 Bus. Law. 101, 117 (November 1983).

Congress recognized that the daunting prospect of withdrawal liability might deter a struggling company from selling a failing division and trying to salvage the others. In order to encourage asset sales, Congress excused companies from withdrawal liability when they sold assets. See 29 U.S.C. sec. 1384. But this exemption was potentially problematic. What if the purchaser withdrew from the plan? Because the MPPAA calculates withdrawal fees based on a five- or ten-year history of contributions to the Plan, "the purchaser's withdrawal liability, calculated as of the date of the sale, would be zero unless the purchaser also had a preexisting contribution obligation to the plan." See Kladder, supra, at 116.

To avoid the "zero liability" scenario, Congress conditioned the seller's withdrawal exemption on the purchaser's assumption of a preexisting obligation to the plan. Specifically, Congress established three conditions for exemption. First, the buyer must assume an obligation to make contributions to the plan at substantially the same level as the seller's contribution. See 29 U.S.C. sec. 1384(a)(1)(A). Second, the purchaser must provide to the plan a bond or escrow account for five plan years commencing with the first plan year beginning after the sale of assets. The bond must be roughly equivalent to the seller's annual contribution for recent years, and will be paid to the plan if the buyer

withdraws or misses an annual contribution to the plan at any time in the five years following the sale. See 29 U.S.C. sec. 1384(a)(1)(B). Finally, the contract for sale must provide that, if the buyer fully or partially withdraws in the five years following the sale and does not pay withdrawal liability, the seller is secondarily liable for the fee. See 29 U.S.C. sec. 1384(a)(1)(C).

B)  The Transfer-Cartage Sale of Assets

In the present case, Central States contends that Transfer failed to obtain an exemption when it sold its assets to Cartage. The arbitrator found that Transfer had properly obtained an exemption. See In the Matter of Nitehawk, Appellant's App. at 37. The district court disagreed. The LaCasse group urges us to defer to the arbitrator. The district court reviewed the arbitrator's actions for clear error, and we apply the same standard in reviewing the district court's decision as that court did in reviewing the arbitrator's interpretation. See Matteson v. Ryder Sys. Inc., 99 F.3d 108, 112 (3d Cir. 1996). Clear error may seem an unusually exacting standard of review for an arbitration award. It is true that Congress specifically stated that "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. sec. 1401(c)./2 But we have recognized that whether a party has successfully structured a transaction to satisfy the statutory standard for exemption is a "classic example[ ] of [a] 'mixed question[ ] of law and fact.'" Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co., 890 F.2d 1405, 1409 (7th Cir. 1989). That is a particularly apt description of the present case, in which the arbitrator was required to compare the terms of the contract with the statutory requirements, and to attach legal significance to Cartage's failure to post a bond. Congress did not set forth a standard by which to review an arbitrator's findings on these types of questions. We resolved in Zahn that the proper standard of review for such questions is for clear error. See id. at 1411. A finding is clearly erroneous if the reviewing court, after acknowledging that the factfinder below was closer to the relevant evidence, is firmly convinced that the factfinder erred. The district court stated, and we agree, that the arbitrator committed clear error on the question whether Transfer's sale of assets merited an exemption. See Mem. Op. at 11.

In this case, the clear error is apparent upon

review of the Purchase Agreement, the provisions of which are fatally noncompliant with the MPPAA. As required by statute, the purchase agreement does seem to obligate Cartage to make payments at substantially the same level as Transfer, thus satisfying the first precondition for exemption./3 But the Purchase Agreement does not assign secondary liability to Transfer. The LaCasse group protests that the contract accomplishes the goal of secondary liability because it calls for Cartage's liabilities to revert back to it in the event of a breach. The arbitrator agreed. See In the Matter of Nitehawk, Appellant's App. at 36. The LaCasse group says "reversion" is called for in sections 14 and 15 of the Agreement. Section 14 states that covenants and warranties will survive closing, and section 15 provides for remedies in the event of a breach of contract. That provision states that in the event Cartage breaches the contract, Cartage, "at [Transfer's] option, will relinquish all title, possession and control of the business and all assets purchased under this agreement to [Transfer]." Appellee's App., Tab 2 at page 10, sec. 15(b). LaCasse testified at his deposition that this language required him to reassume liabilities if Cartage were to breach the contract. Contrary to that interpretation, the plain language does not call for an automatic reversion to Transfer or require that Transfer reassume liabilities. It states only that Cartage would have to turn the business back over to Transfer "at [Transfer's] option." Appellee's App., Tab 2 at page 10, section 15(b) (emphasis added). We need not speculate whether Transfer would have exercised that potentially dubious option if Cartage's prospects had gone south. As discussed above, Congress did not want to leave pension plans without recourse if buyers "vamoosed" without paying withdrawal fees. See Artistic Carton Company v. Paper Industry Union-Management Pension Fund, 971 F.2d 1346, 1352-53 (7th Cir. 1992). Congress considered it crucial that sellers be bound to pay withdrawal liability if buyers proved unsound. The contract involved here does not bind Transfer, and therefore the sale of assets cannot be exempt.

This failure alone is enough to deprive the asset sale of the exemption. Moreover, we note that Transfer and Cartage bungled the bond requirement. The arbitrator concluded that the failure to post bond was "not determinative of this dispute," because Central States' interests were protected. In the Matter of Nitehawk, Appellant's App. at 37. The district court stated, and we agree, that this is a second instance of clear error. As discussed above, the purchaser must furnish a bond "commencing with" the first plan year after the sale of assets. See

29 U.S.C. sec. 1384(a)(1)(B). This is not an empty formality; it forces the buyer to back up its promise to pay the seller's withdrawal liability until the buyer accrues its own liability. See, e.g., Artistic Carton, 971 F.2d at 1352. (One might wonder what the buyer receives in exchange for accepting the liability and putting additional money down. Presumably, the sale price for the assets reflects the liabilities that go along with them. See, e.g., 5 Erisa Litigation Rep. 13, 16 (April 1996) ("the issue of additional contingent liability [if the contribution history is to be transferred to the buyer] can be factored into the sales price.")). In the present case, Cartage did not post a bond. The plan may waive the bond requirement if the parties request a waiver and meet certain statutory conditions, one of which is a bond amount less than $250,000. See 29 C.F.R. sec. 4204. There is no question in this case that the parties would have qualified for the exemption because the amount of the required bond was less than $250,000. But the parties erred procedurally. First, Transfer requested the bond exemption alone, when the statute explicitly states that "the parties" must request a waiver. Further, Transfer waited until six months into the first plan year to seek the bond waiver. See Record Vol. I at Tab 5. Transfer argues that Cartage did not have to post the bond until the end of the first plan year, and therefore its waiver request was timely if filed before the expiration of the plan year.

We find the waiver request inadequate. First, Cartage did not participate in the waiver request. This alone makes it invalid. See Brentwood Fin. Corp. v. Western Conference of Teamsters Pension Fund, 902 F.2d 1456, 1461 (9th Cir. 1990) (seller's request for waiver insufficient). And it is not as though we are punishing Transfer for Cartage's lapse; Transfer could probably have met the requirement of a joint request by simply asking a Cartage official to sign the waiver request it drafted, but it did not. Additionally, we doubt the request was timely. We have stated as a general matter that the determination as to whether the purchaser has met the requirements for an exemption is at the time of the sale, not afterwards. See Central States, Southeast and Southwest Areas Health and Welfare Fund v. Cullum Companies, Inc., 973 F.2d 1333, 1338 (7th Cir. 1992). This principle pulls us towards the Fund's view that Cartage had to either post the bond or request the variance at the start of the plan year./4 Transfer makes another, more fanciful, argument, that a seller need not satisfy the requirements for withdrawal liability exemption until there is a complete withdrawal. Cullum nips this argument in the bud:

the time of sale is the time to satisfy the requirements. In sum, we conclude that when the LaCasse group sold Transfer's assets to Cartage, it failed to comply with two of the three requirements necessary to secure an exemption from withdrawal liability.

The arbitrator held that the shutdowns of Hines and Nitehawk were not sufficient to trigger withdrawal liability because the Transfer sale was exempt. That finding of exemption was clear error on a mixed question of law and fact; once it is reversed, the arbitrator's conclusion regarding the availability of withdrawal liability (which is probably best characterized as a mixed question of law and fact) is also clearly erroneous. Together, the shutdowns of Hines, the non-exempt sale of Transfer's assets and the shutdown of Nitehawk amounted to a complete withdrawal from the Plan, sufficient to trigger withdrawal liability.


C)  Apportioning Contribution History

The remaining question is how to apportion the LaCasse group's contribution history among the parties in this case. Because the arbitrator did not think the group had withdrawn, it did not hazard a calculation. The district court, in granting summary judgment, deleted Transfer's contribution history from the LaCasse group and attributed it to Cartage./5 We review this grant of summary judgment de novo. See Hunt Truck Lines, 204 F.3d at 742. The most precise and authoritative guide to allocating contribution history in the present circumstance has been offered by the Pension Benefit Guaranty Corporation. As the agency charged with interpreting the MPPAA, the PBGC is entitled to substantial deference when it construes the statute. See Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208, 210 n.2 (7th Cir. 1989). PBGC Opinion Letters are not as authoritative as PBGC regulations, but they have been discussed in the same vein as Revenue rulings. See, e.g., Blessitt v. Retirement Plan for Employees of Dixie Engine Co., 848 F.2d 1164, 1170-73 (11th Cir. 1988). In PBGC Opinion Letter 92-1, the agency considered a complex scenario in which a controlled group like LaCasse shed four subsidiaries, each accounting for 25 percent of the group's contributions to a multiemployer pension plan. See PBGC Op. Ltr. 92-1, 1992 WL 425182 (March 30, 1992) (hereinafter PBGC Letter). The PBGC's hypothetical controlled group sold the assets of subsidiary B in a non-exempt sale, just as LaCasse sold the assets of Transfer. See id. at 1. The PBGC stated that "the contribution history

of [the subsidiary] remains part of the controlled group's contribution history for purposes of calculating amounts of subsequent withdrawal liability." Id. at 2. Indeed, the PBGC intimated that the only reason the sale of subsidiary B did not trigger liability itself was that it caused a drop of just 25 percent in the controlled group's contributions to the Fund. See id. In the present case, the Fund explains that it did not view Transfer's withdrawal as causing the required three-year drop in contributions to qualify as a partial withdrawal. So the sale did not--as in the PBGC hypothetical--trigger liability. Therefore, Transfer is in exactly the position of the PBGC's hypothetical asset seller, and just as the contribution history remained with the seller in that case, it must remain with the seller in this case.

The district court relied on a different and, we think, less analogous passage in the PBGC letter to reach the opposite result. In that passage, the PBGC instructed that if the controlled group sold the stock of one subsidiary, and the controlled group later withdrew, the group's liability would be determined without reference to the contribution history of the subsidiary whose stock had been sold. See id. at 3. Why? And why doesn't the same reasoning apply to a sale of assets? The answer is that a sale of stock is covered by a different provision of the statute, 29 U.S.C. sec. 1398, which specifies that the successor employer resulting from such a transaction "shall be considered the original employer." Therefore, under the statute, the contribution history of a subsidiary whose stock is sold automatically transfers to the buyer. See PBGC Ltr. at 2-3. This statutory dictate reflects the longstanding principle of corporate law that "a purchaser of corporate stock takes the risk of all outstanding corporate liabilities, except in so far as the contract of purchase may provide otherwise." Ford Motor Co. v. Dexter, 56 F.2d 760, 761 (2d Cir. 1932).

The Ninth Circuit analyzed a situation similar to the one before us in Penn Central Corp. v. Western Conference of Teamsters Pension Trust Fund, 75 F.3d 529 (9th Cir. 1996). In that case, the parent company of a controlled group shut down two subsidiaries. It then sold the stock of a third subsidiary. See id. at 533. Because the stock sale caused the controlled group to cease contributions to the Fund, withdrawal liability was triggered. The Ninth Circuit attributed the subsidiary's contribution history to the purchaser. But it allocated the contribution history for the two shuttered subsidiaries to the seller. Id. at 533. It reasoned that when the

MPPAA equated the purchaser with the "original employer," it meant for the purchaser to become responsible only for the liability of the subsidiary it bought. This result confirms our view that the "original employer" provision for stock sales merely codifies the principle that a stock purchaser takes the liability associated with that stock.

In the present case, Cartage did not purchase Transfer's stock. So although the case seems superficially analogous to Penn Central, it is actually quite different. Under neither corporate law nor the MPPAA did Transfer's liabilities--in particular, its contribution history--automatically shift to the purchaser. The MPPAA and the PBGC's interpretations of it clearly indicate that unless the purchaser of assets assumes withdrawal liability by taking the prescribed steps, the contribution history and associated withdrawal liability stay with the seller. So neither Penn Central nor the latter portion of the PBGC Opinion Letter are as instructive as the early portion of the PBGC Opinion Letter which demonstrates that the contribution history for a non-exempt sale of assets remains with the seller.

But the district court did not rely solely on the PBGC Opinion Letter and Ninth Circuit opinion. The judge trusted his own eyes, and it is much harder for us to discount his view than it was to distinguish the authority he invoked. At the time of the 1992 sale, Cartage was not legally responsible[6] for Transfer's pre-sale contribution history and thus could have escaped withdrawal liability. But by the time the case reached Judge Nordberg in 1997, Cartage would have been on the hook for withdrawal liability based on the five-year contribution history it had accrued since the purchase. The court seemed to reason that because the Fund had suffered no harm, it was not justified in seeking to punish Transfer.[7]

The "no harm, no foul" approach is instinctively appealing in the circumstances, because a retrospective view may cast more light on the relative rights and obligations of the parties than would a prospective view at the time of sale. Still, we must reject it. We have in the past expressly refused to examine harm that arises after a sale of assets in determining the status of that sale. See Cullum, 973 F.2d at 1338. In Cullum, the parties completed an exempt sale of assets, in which the buyer was obligated, under the purchase agreement, to contribute to the plan. See id. The buyer eventually reneged on this obligation and the Fund assessed withdrawal liability against the seller, reasoning that the

sale of assets was not exempt because the buyer did not follow through on its obligation. We held that the exempt status of the sale was to be determined at the time of sale. See id. If the buyer pledged to make contributions at the time of sale, its eventual bad faith would not change the status of the sale. The same principle that worked to the seller's advantage in Cullum must be applied here to the seller's detriment. At the time of the transaction, the sale did not meet the statutory requirements whereby Transfer's contribution history was shifted to Cartage. Cartage's good faith in continuing to make contributions, thereby building up its own history on which withdrawal liability could eventually be calculated, does not change the fact that the sale was not exempt. The LaCasse group had one opportunity to discard Transfer's contribution history--during the sale--and it did not do so.

We recognize that in some circumstances, contemporaneous analysis will look like a trap for the unwary. But the opposite approach--asking courts to calculate withdrawal liability retrospectively--would force the parties to scan a kaleidoscope, in which constantly changing facts assume rising and falling importance until the arbitrary moment in time when an opinion issues. That would undermine the very certainty the MPPAA was meant to guarantee. So we have adopted an arguably imperfect standard in the service of MPPAA's rules of general application (which may ill fit, under particular circumstances, the realities of these transient corners of the economy). For instance, in Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., 788 F.2d 428, 432 (7th Cir. 1986), we refused to excuse a bankrupt company from withdrawal liability even though its workers went on to retire and thus foreclose the need for pension contributions, or went on to obtain new jobs where the new employer paid their contributions. We suggested that the Fund's lack of injury was merely fortuitous, and applied a prospective approach to withdrawal liability that would protect the Fund in the event it was not as lucky the next time. See id. at 432 n.2.

The LaCasse group urges that we have taken a flexible line in the past in order to achieve an equitable result, citing Central States, Southeast and Southwest Areas Pension Fund v. Bell Transit, 22 F.3d 706 (7th Cir. 1994). In Bell, the employer sold its assets in an exempt sale, and retained an amount of cash. The Fund learned of the withheld cash, and determined that the seller had "liquidated." Id. at 708-09. Under the MPPAA, if the seller liquidates within five years after the sale, it is required to post a bond, which the seller in Bell had not done.

Because the seller had posted no bond, the Fund tried to assess withdrawal liability against it. We blocked this effort, stating that the Fund should only be able to recover the bond amount (preferably through a civil action), instead of assessing withdrawal liability against the seller and giving the Fund a "windfall." Id. at 712. At first blush, it may seem that we "manipulated" the statute in order to achieve a "fair" result. But a close reading of Bell reveals that it was just another application of the "contemporaneous analysis" rule. We found that the sale was exempt when transacted, and could not be unraveled by a subsequent failure to post bond for the eventual liquidation. See id. at 711-12. The LaCasse group argues that Bell sets a precedent against "extra" payments to the Fund. But in Bell, the Fund was not entitled to withdrawal liability at the time of sale, so permitting a delayed assessment of liability would have paid to the Fund something that was not owed. Here, the Fund was entitled to withdrawal liability at the time of sale.

Ultimately, the district court seemed persuaded by the LaCasse group's protestation that forcing it to pay withdrawal liability would give the Fund a "double recovery." See Mem. Op. at 13. We, too, are troubled by the possibility that the Fund may recover more than is required to fully fund these workers' benefits. After all, it is the job of courts to do justice, not make superfluous awards as punishment for technical errors. However, on further examination, we see nothing at stake here to compel us to ignore the statutory requirement that sellers meet certain conditions to qualify for an exemption or to ignore our own precedent assessing the validity of an exemption at the time of sale or the PBGC's instruction that non-exempt sellers retain their contribution history.

In a pension plan, "[w]orkers' benefits may be stated as a percentage of their highest average incomes . . . multiplied by the number of years of covered employment." Artistic Carton, 971 F.2d at 1351. Multiemployer pension plans generally employ "cliff vesting," meaning that after a fixed number of years of service, employees gain a nonforfeitable right to the benefits they have accumulated. See Angell & Polk, Multi-Employer Plans, in II Employee Benefits Law sec. 14.6 (Illinois Institute of Continuing Legal Education, 1994). Then, as explained in Artistic Carton, an employee's vested benefits will continue to grow as long as he continues to rack up additional years of service. See 971 F.2d at 1351. Importantly, one feature of multiemployer plans is the "portability" of pension credits. See Angell & Polk, supra, at sec. 14.7. This means that a worker may leave one Plan participant and

join another, bringing with him the "years of service" from his previous job. Withdrawing employers stop making contributions on behalf of employees before the employees have retired. Withdrawal liability is supposed to represent the amount that, "when invested, would theoretically produce . . . a sum precisely sufficient to pay (the employer's proportional share of) a plan's estimated vested future benefits." Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 426 (1995). Central States apparently bases withdrawal liability on an employer's past ten years of contribution history (at least that is what it did for the LaCasse group)./8 At the time of withdrawal, some variables necessary to determining each workers' benefits upon retirement are necessarily unknown. For instance, the employer cannot know how many years of service a worker will have accrued by the time he retires or how much his salary might rise before that time. And before the Fund can calculate the amount of money that must be invested today to guarantee adequate benefits at retirement, it must discount future benefits to their current value. The Fund has wide discretion in adopting a valuation method, but many such methods depend in part on current market values, which will almost certainly fluctuate over time. See, e.g., Masters, Mates & Pilots Pension Plan v. USX Corp., 900 F.2d 727, 730-33 (4th Cir. 1990).

Based on this background, we see that the equities of withdrawal liability are debatable in a number of scenarios. In the paradigmatic case, the non-exempt seller such as the LaCasse group must pay withdrawal liability on behalf of its employees. And a non-exempt buyer like Cartage would have no withdrawal liability even if it went out of business immediately. The MPPAA rules were tailored to this circumstance, and they work appropriately to guarantee that the Fund is covered by the party who is equitably responsible for the unfunded vested benefits. But the rule leads to awkward results elsewhere. For instance, what if a non-exempt seller were forced to pay withdrawal liability, and the buyer in that sale shut down only after ten years of pension payments? The buyer would be assessed withdrawal liability based on the ten-year contribution history it had amassed, on top of the seller's withdrawal liability. Therefore, both the seller and the buyer will have made "full" withdrawal liability payments; that is, each will have paid the amount that, when invested, would result in the promised benefits at retirement. But, this is not quite the case because, after working ten years for the second employer, the workers' promised benefits (which are based on accrued years of service) will be higher. Additionally,

the applicable valuation rates and actuarial estimates may have changed in the intervening years, as they are based in part on market values. So in this scenario--which is essentially the same as the dispute between the LaCasse group and the Fund--the Fund may have recovered more than necessary to fully fund the workers' unfunded vested benefits. But it is difficult for a reviewing court--not privy to the Fund's changing valuation methods or the individual workers' records--to know how much "excess" the Fund stands to recover. We are left only with the queasy feeling that by mechanically applying a rule of general application, we may be leaving the Fund in this instance more than whole.

At the same time, it would not be feasible for us to attempt to apply some general rule of equity to right this seeming wrong because, when dealing with the MPPAA and the many variables involved in calculating withdrawal liability, it is extraordinarily hard to know what is necessary to adequately fund the pension plan and simultaneously do equity to the participants. What might come to mind is some sort of overriding rule stating that ultimately the seller can be liable for no more than is required to make the Fund whole. This rule might be feasible to administer, and would place on the Fund the burden of demonstrating the extent of its injury, an exercise it has not attempted in the present case. But Congress has not seen fit to provide such a rule, and especially considering the uncertainties involved, it is impermissible to provide one by judicial fiat. Whether such a rule is warranted is a policy judgment, requiring that the possibility of excess recovery be weighed against the need for guaranteeing adequate funding of pensions under all circumstances.

At any rate, given our reluctance to fashion some equitable rule on our own, we find that the potential excess recovery in this case does not violate the MPPAA and is probably within the bounds of equity. To the extent that the possibility of excess recovery might offend considerations of equity, this may be an inescapable price Congress has elected to pay in adopting the statutory rules. We believe that the statute and its administrative interpretations must continue to be refined to minimize the chance of duplicative recoveries and other arguable inequities. And to relieve judicial concern about excess recovery, the Fund must be concerned with showing the equity of its demands as well as their conformance with the technical requirements of the Act.

D) Attorney's Fees

Finally, Central States appeals the district court's decision to vacate the award of attorney's fees to Central States based on the Fund's success in securing interim payments while the arbitration was pending. According to the MPPAA, an employer must pay a withdrawal liability assessment according to a schedule set by the pension fund, "notwithstanding any request for review or appeal of determinations of the amount of such liability . . ." 29 U.S.C. sec. 1399(c)(2). This provision captures the MPPAA's "pay now, arbitrate later" principle. See Central States, Southeast and Southwest Areas Pension Fund v. Wintz Properties, Inc., 155 F.3d 868, 872 (7th Cir. 1998). The statute further provides that "any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title.)" 29 U.S.C. sec. 1451(b). Finally, the statute provides that in any action by a plan to enforce an employer's delinquent contributions, "the court shall award the plan" . . . "reasonable attorney's fees and costs of the action" if the action results in a "judgment in favor of the plan." 29 U.S.C. sec. 1132(g)(2) (emphasis added).

The LaCasse group argues that "no notice of a demand for payment was ever given to Six Transfer and therefore, it cannot be liable for interim payments." Appellant's Br. at 19. But the notice sent to the group upon the withdrawal of Nitehawk states that it covers "all members of any controlled group . . . of which [Nitehawk] is a member." Appellee's App. at 19. Notice to one controlled group member constitutes notice to all. See, e.g., Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1375 (7th Cir. 1992). Further, the Fund's extensive documentation of its liability assessment clearly reflects that its calculations reflected the contribution histories of Nitehawk, Hines, and Transfer. So the LaCasse group must have understood that it was to pay withdrawal liability for Transfer. The LaCasse group did not pay the liability before beginning arbitration, and it was therefore delinquent. Section 1132 seems to us to mandate that the LaCasse group pay the fees if Central States won a judgment on the interim payment issue, notwithstanding the ultimate outcome of the case. The district court viewed the outcome of this case as a partial victory for each side. See Appellant's App. at 21 (Order of May 19, 1999). But we have suggested that an interim payment order was a final order on the limited issue of which party gets to hold the stakes during an arbitration. See Trustees of the Chicago Truck Drivers, Helpers and Warehouse

Workers Union (Independent) Pension Fund v. Central Transport, Inc., 935 F.2d 114, 116-17 (7th Cir. 1991). The MPPAA's interim payment provision reflects Congress's concern that thinly capitalized employers who are not forced to pay prior to arbitration may empty their pockets by the time an arbitrator determines they owe money to the Fund. See id. So the interim payment accomplishes a goal entirely different from the arbitration on the merits. As such, the Fund's victory in securing interim payments cannot be undone by a loss at the merits stage. Therefore, the district court did not have discretion to vacate the award of attorney's fees for that portion of the litigation.

III)   Conclusion

In sum, we affirm the district court's finding that the Transfer-Cartage sale did not meet statutory requirements and therefore did not exempt Transfer from payment of withdrawal liability. We affirm the district court's conclusion that when Nitehawk withdrew from Central States, the LaCasse group effected a complete withdrawal from the Fund. We affirm the district court's conclusion that the assessment of withdrawal liability against the LaCasse group is warranted. We reverse the district court's conclusion that Transfer's contribution history should be excluded from the computation of the LaCasse group's withdrawal liability, and remand for a calculation reflecting the contribution histories of all three employer-members of the group. Finally, we reverse the district court's decision to vacate the attorney's fees initially awarded to the Fund for its success in securing interim payments from the group, and we remand for reimposition of an order in accord with this opinion. Each party to bear its own costs.

/1 Central States filed its notice of appeal June 18, giving the LaCasse group 14 days to file its appeal. It appears the LaCasse group sent its papers via UPS Next-Day Air on June 29, 1999. The clerk's office inadvertently recorded receipt on July 6, but noted the date July 1 on the check sent with the appeal, suggesting that filing was timely. Therefore, we reject Central States' contention that the LaCasse group did not file its appeal timely, and that this court does not have jurisdiction.

/2 Notably, the standard of review for statutorily mandated MPPAA arbitrations is not as deferential as it is for labor arbitrations conducted pursuant to collective bargaining agreements (the arbitrator's award must be enforced "so long as

it draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960)), or voluntary commercial arbitrations conducted pursuant to the Federal Arbitration Act (a district court may vacate an arbitration award if, inter alia, "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. sec. 10(a)(4)). "Section 1401(b)(3) of MPPAA indicates the Arbitration Act, which governs voluntary arbitration, applies only to the extent it is consistent with MPPAA . . . [T]he severely limited review required by section 10 of the Arbitration Act is inconsistent with section 1401(b)(2) of MPPAA, and the latter prevails." Union Asphalts and Roadoils, Inc. v. Mo-Kan Teamsters Pension Fund, 857 F.2d 1230, 1234 (8th Cir. 1988).

/3 The relevant provision reads as follows:

Buyer will assume all obligations of Six Transfer, Inc. pursuant to any and all collective bargaining agreements in effect between Six Transfer, Inc. and Teamsters Local Union 120 of St. Paul, Minnesota which contract covers certain employees of Six Transfer, Inc.

Buyer will also assume any and all potential withdrawal liability to the Central States Pension Fund into which contributions were made pursuant to the above referenced collective bargaining agreement with Local 120. Buyer will continue to make payments for contributions to the pension fund and comply with any other obligations pursuant to the collective bargaining agreement.

Appellee's App., Tab 2 at pages 7-8, sec. 7.

/4 The Ninth Circuit reached a similar conclusion in a case where the seller claimed that it "substantially satisfied" the bond requirement by challenging withdrawal liability, thus notifying the Fund that it was entitled to a bond waiver. See Brentwood Fin. Corp. v. Western Conference of Teamsters Pension Trust Fund, 902 F.2d 1456, 1461 (9th Cir. 1990). The court held that the "practical effect" of such a course would be to do away with the bond requirement. Here, too. If Transfer's theory were correct, parties to a sale could evade the bond requirement for a year.

/5 One might wonder whether the district court should have remanded the question of allocation to the arbitrator, and whether we should do so. There is no clear instruction in the MPPAA. But

we have stated as a general matter that "[w]hen possible, . . a court should avoid remanding a decision to the arbitrator because of the interest in prompt and final arbitration." See Publicis Communication v. True North Communications Inc., 206 F.3d 725, 730 (7th Cir. 2000) (quoting Teamsters Local No. 579 v. B & M Transit, Inc., 882 F.2d 274, 278 (7th Cir. 1989) (citations omitted). In the present case, neither party contested the district court's authority to decide a question left open by the arbitrator, and both parties have briefed the issue to us. So we think it sensible and fair to consider the issue.

/6 When we speak of "legal responsibility," we do not mean contractual responsibility. It is pretty clear that the Purchase Agreement obligates Cartage to make ongoing contributions and pay withdrawal liability. But this obligation runs to Transfer. Had Cartage withdrawn and declined to pay withdrawal liability, the Fund faced uncertain prospects for collecting from Cartage. Cases construing the MPPAA have held that successors in non-exempt sales may be liable for withdrawal liability. See, e.g., Artistic Carton Co. v. Paper Industry Union Management Pension Fund, 971 F.2d 1346, 1352 (7th Cir. 1992). But here a non-exempt successor has not posted a bond and therefore the Fund would have to invest time and money to collect the debt. And if a "successor" suit against Cartage proved fruitless, the Fund would have no recourse against Transfer, which is not secondarily liable under the Purchase Agreement. Because the Fund would have no recourse against Transfer (this is assuming Transfer need not pay withdrawal liability), Transfer might well refuse to pay the Fund. So Transfer--the only party to whom Cartage owed a contractual duty to pay--would have no reason to sue Cartage for damages. Consequently, by "legal responsibility" we mean a responsibility recognized by the MPPAA and enforceable by the Fund.

/7 In effect, the Fund seemed to be saying, "Now we know we didn't lose any money, so why don't you give us some more?"

/8 Notably, if the parties had successfully structured this as an exempt sale of assets, five years of Transfer's contribution history on behalf of its employees would have "vanished." See Angell & Polk, Multi-Employer Plans, in II Employee Benefits Law sec. 14.29(5) (Illinois Institute of Continuing Legal Education 1994). Though the Fund will assess liability against Transfer for ten years of contributions, Cartage would have adopted just five years of Transfer's contribution history. If Cartage withdrew, it

would have owed significantly less than Transfer.