813 F.2d 760
 8 Employee Benefits Ca 1534
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND
and Howard McDougall, as Trustee, Plaintiffs-Appellants,
v.
888 CORPORATION, Defendant-Appellee,
and
Powers Industries, Inc., Barry Steel Corporation and
Intervale Steel Corporation a/k/a Alain, Inc.,
Third-Party Defendants-Appellees.
 Nos. 85-1664, 85-1914.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 20, 1986.
Decided March 12, 1987.
As Amended June 2, 1987.
 
 1
 Russell N. Luplow, Elizabeth Roberto (argued), Bloomfield Hills, Mich., for plaintiffs-appellants.
 
 
 2
 John K. Parker (argued), Bushnell, Gage, Doctoroff & Reizen, Southfield, Mich., John M. Rickel, Rickel, Earle & Wokas, Detroit, Mich., Kathleen M. Kundar (Barry Steel) (argued), Fox, Glynn & Melamed, New York City, for defendant-appellee.
 
 
 3
 Before GUY, Circuit Judge; EDWARDS, Senior Circuit Judge; and EDGAR, District Judge.*
 
 
 4
 EDGAR, District Judge.
 
 
 5
 Central States, Southeast and Southwest Areas Pension Fund (the "Fund") appeals the district court's grant of summary judgment in favor of the 888 Corporation ("888"). The Fund is a multiemployer plan as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1002(37), 1301(a)(3). 888, formerly known as the Barry Steel Corporation, is a Michigan corporation which previously maintained two separate Divisions, Barry Steel and Intervale Steel, each operating a steel producing facility in Detroit. 888 sold its Barry Steel Division and its Intervale Steel Division in 1980 and 1981, respectively.[1] In 1984, the Fund brought the action below under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. Secs. 1381-1453, to recover a withdrawal liability valued at $1,558.361.74. This liability was assessed by the Fund based on the past contributions to the Fund on the part of both of 888's divisions.[2] In addition to the withdrawal liability assessment, the Fund requested interest on the assessment from the date of 888's alleged default as well as attorney's fees.
 
 
 6
 The district court found that subsequent to the filing of the action below, key MPPAA provisions affecting 888's withdrawal liability were substantially amended by Sec. 558 of the Deficit Reduction Act of 1984 ("DEFRA"), Pub.L. No. 98-369, 98 Stat. 494, 899, rendering the assessment against 888 invalid to the extent that the assessment was calculated using 888's contributions to the Fund under the Barry Steel Division's collective bargaining agreement.[3] 888 did not dispute its liability under MPPAA for the amount of the withdrawal liability incurred as a result of the Intervale Steel Division sale. The court therefore granted 888's motion for summary judgment, dismissing the Fund's claim for withdrawal liability, and remanded the case to an arbitrator for a determination of 888's remaining withdrawal liability based on calculations using the Intervale Steel Division contributions only. The district court also awarded 888 a portion of its claimed attorney's fees. The Fund now appeals these decisions. For the reasons discussed below, the district court's decision as to 888's withdrawal liability is affirmed and the district court's ruling on attorney's fees is reversed.I.
 
 
 7
 Prior to 1980, 888, then known as Barry Steel Corporation, maintained two distinct divisions, the Barry Steel Division and the Intervale Steel Division. Each division had its own independent facility and maintained separate collective bargaining agreements ("CBAs") with different Teamsters bargaining units. These CBAs were independently negotiated and contained different pay schedules and work regulations and required separate contributions to the Fund on behalf of each facilities' employees.
 
 
 8
 On September 5, 1980, 888 entered into an agreement to sell its Barry Steel Division. The sale was closed on December 8, 1980. The purchaser acquired the facility along with the Barry Steel name, and also assumed all of 888's obligations under the CBA, including the obligation to contribute to the Fund. 888, therefore, had a binding agreement to withdraw from the Fund on September 5, 1980, and after December 8, 1980, 888 had no further obligation to contribute to the Fund for its former employees at the Barry Steel Division.
 
 
 9
 In September 1981, 888 sold its remaining steel division, the Intervale Steel Division, to a purchaser which, as in the Barry Steel Division sale, assumed 888's obligation to contribute to the Fund under the relevant CBA. As of September 1981, therefore, 888 ceased to have any obligation to contribute to the Fund under the Intervale Steel Division CBA.
 
 
 10
 On May 3, 1983, the Fund made demand upon 888 for payment of $1,558,361.74 as 888's withdrawal liability assessment. This assessment was calculated using 888's past contributions to the Fund for both the Barry and Intervale Steel Divisions. See supra note 2. 888 sought review of this integrated assessment by the plan sponsor as provided for under MPPAA, and the Fund affirmed its assessment. See 29 U.S.C. Sec. 1399(b)(2)(A)-(B). 888 did not thereafter initiate arbitration of the assessment within the time period proscribed by 29 U.S.C. Sec. 1401(a).
 
 
 11
 On March 1, 1984, the Fund brought this action in the district court to collect the outstanding assessment along with interest from the date of 888's default, attorney's fees, costs and damages. 29 U.S.C. Secs. 1132(g)(2), 1451(b), (e). 888 denied liability and asserted a defense based upon Sec. 558 of DEFRA. See supra note 3. 888 also filed third party complaints against the two purchasers of its former steel Divisions for indemnification. These third party actions are still pending in the district court. On January 23, 1985, 888 moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss the Fund's claim for withdrawal liability on the basis of DEFRA's Sec. 558.
 
 II.
 
 12
 The district court accepted 888's defense based on DEFRA and granted 888's motion for summary judgment. The court below concluded that Sec. 558 of DEFRA was "clearly" intended by Congress to eliminate MPPAA's retroactive withdrawal liability assessments. The court apparently found retroactive application in the present case as it held that 888 was relieved of the withdrawal liability assessment to the extent that that assessment was based on the contribution history generated by the Barry Steel Division. The court further ordered that any dispute as to the amount of the remaining assessment to be paid because of the 1981 sale of the Intervale facility was to be resolved by arbitration.
 
 
 13
 The Fund subsequently filed a motion with the district court asking for a reconsideration. The Fund requested that the district court reverse itself and hold 888 liable for the entire amount of the withdrawal liability requested by the Fund, or, in the alternative, that the court require 888 to pay a portion of the integrated assessment that the Fund maintained was based solely on the contribution history of the Intervale Steel Division. This motion marked the first time that the Fund departed from its position demanding payment of the assessment calculated from the contribution histories for both the Barry Steel and Intervale Steel Division's employees. The district court denied the Fund's motion for reconsideration on the ground that no "palpable defect which ... misled the court" had been demonstrated. In a separate, later action, the court awarded 888 a portion of its claimed attorney's fees, pursuant to 29 U.S.C. Sec. 1451(e). The Fund now appeals both the denial of its motion to reconsider and the grant of attorney's fees.
 
 III.
 
 14
 The first issue to be addressed on appeal must be the Fund's allegation that 888 may not contest the integrated assessment because it waived any right to dispute the amount of the assessment by not initiating arbitration in accordance with 29 U.S.C. Sec. 1401 within 60 days of the assessment's notice. 29 U.S.C. Sec. 1401(b)(1) provides that: "If no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall due and owing on the schedule set forth by the plan sponsor." The Fund maintains that this section bars 888 from contesting any aspect of the withdrawal liability since 888 did not properly request arbitration. See T.I.M.E.-DC, Inc. v. Management-Labor Welfare & Pension Funds, 756 F.2d 939, 941-45 (2d Cir.1985); New York State Teamsters Conference Pension and Retirement Fund v. St. Lawrence Transit Mix Corp., 612 F.Supp. 1003, 1006 (N.D.N.Y.1985).
 
 
 15
 888's failure to exhaust available administrative remedies by submitting this dispute to arbitration within the 60 day period by MPPAA is not a bar to the district court's jurisdiction in this case. The general doctrine which requires the exhaustion of administrative remedies is subject to a number of exceptions. The doctrine is to be applied with "an understanding of its purposes and of the particular administrative scheme involved." McKart v. United States, 395 U.S. 185, 193, 89 S Ct. 1657, 1662, 23 L. Ed. 2d 194 (1969). While this Court has recently held in Marvin Hayes Lines, Inc. V. Central States, Southeast and Southwest Areas Pension Fund, 814 F.2d 297, 300 (6th Cir. 1987), that disputes under the MPPAA are normally to be resolved by the arbitral process, the particular facts of this case make a prior resort to arbitration inappropriate.
 
 
 16
 888's defense the the Fund's assessment was based on DEFRA's Sec. 558, which had not been enacted at the time the Fund made demand upon 888 for the withdrawal liability. Section 558 became law on July 18, 1984, approximately one year after 888's deadline for requesting arbitration had passed, and four and one-half months after the Fund filed this lawsuit. We decline to find that 888 is out of court because it failed to arbitrate a defense that it did not have.
 
 
 17
 The purpose of the exhaustion of administrative remedies doctrine is to permit an administrative agency to apply its special expertise in interpreting relevant statutes and in developing a factual record without premature judicial intervention. Southern Ohio Coal Co. v. Donovan, 774 F.2d 693, 702 (6th Cir. 1985), amended, 781 F.2d 57 (6th Cir. 1986). An overall goal is to promote judicial economy. Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290, 296 (3d Cir. 1982).
 
 
 18
 Since the facts surrounding 888's DEFRA defense are not in dispute, there is no need here to develop a factual record. No particular agency expertise is needed to decide the issue in this case. Judicial economy would not be served by requiring 888 to submit this case to arbitration only to be told by an arbitrator it had failed to make a timely demand for arbitration. Where the purposed behind the exhaustion of administrative remedies doctrine are not served, exhaustion will not be required. Southern Ohio Coal Co., 774; Shawnee Coal Co. v. Andrus, 661 F.2d 1083, 1093 (6th Cir. 1981).
 
 IV.
 
 19
 Before further discussion of 888's defense based on DEFRA's Sec. 558, a brief examination of the background of ERISA and MPPAA is necessary. ERISA was enacted to regulate private employer pension plans. Under ERISA, an employer who withdrew from a multiemployer pension plan could be liable in some circumstances for a share of the unfunded portion of vested benefits in the plan. 29 U.S.C. Secs. 1363-64. However, ERISA provided that if the multiemployer plan survived for five years after an employer withdrew, the employer would not be liable for any unfunded benefits should the plan fail sometime after the five years. 29 U.S.C. Sec. 1363(c)(2). Acting at least partly out of a concern that many employers were withdrawing from multiemployer plans on the gamble that the plan would survive for the five years after their departure, Congress enacted MPPAA. See H.R.Rep. No. 96-869, 96th Cong., 2d Sess., 52-57 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News 2918, 2920-25. Although MPPAA did not become law until September 26, 1980, MPPAA as enacted imposed a withdrawal liability[4] on any employer who either partly or completely withdrew from a plan after April 29, 1980. 29 U.S.C. Sec. 1461(e) (1982) (amended 1984). MPPAA was made retroactively effective in order to prevent employers from withdrawing from multiemployer plans during congressional debate of MPPAA. Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 723, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984) (holding MPPAA's retroactivity constitutional). In 1984, Congress concluded that MPPAA's retroactive effective date was unduly harsh towards employers who withdrew from multiemployer plans after April 29 but before September 26, 1980 and unnecessary to preserve the financial integrity of multiemployer plans. Staff of Joint Comm. on Taxation, 98th Cong., 2d Sess. General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 893 (Joint Comm. Print 1985) (hereinafter cited as "Joint Comm. General Explanation"). See also Debreceni v. Outlet Co., 784 F.2d 13, 16-17 (1st Cir.1986); Long Island Oil Products Co., Inc. v. Local 553 Pension Fund, 775 F.2d 24, 27 (2d Cir.1985). Congress, therefore, repealed the retroactive provisions of MPPAA in the 1984 tax bill, DEFRA. In section 558 of DEFRA, Congress made September 26, 1980 the effective date of the withdrawal liability provisions.
 
 
 20
 Section 558 of DEFRA is labeled "Elimination of Retroactive Application of Amendments Made by Multiemployer Pension Plan Amendments Act of 1980." See supra note 3. Section 558(a)(1) provides that any withdrawal liability incurred by an employer as a result of a partial or complete withdrawal before September 26, 1980 is void. DEFRA also provides that any amount paid by an employer to a plan as a result of an assessment based on a complete or partial withdrawal by an employer from a multiemployer plan after April 28, 1980, but before September 26, 1980, will be refunded to the employer. Sec. 558(a)(2).
 
 
 21
 DEFRA's Sec. 558 contains a special provision for transactions in which a binding agreement to withdraw from a multiemployer plan was entered into before September 26, 1980. Section 558(d) makes the relevant date for determining when a transaction occurred for the purposes of MPPAA the date a binding agreement to terminate an obligation to a plan was entered into rather than the date on which the obligation actually ceased. Section 558(d) provides that: "In the case of an employer who, on September 26, 1980, has a binding agreement to withdraw from a multiemployer plan, subsection (a)(1) shall be applied by substituting 'December 31, 1980' for 'September 26, 1980.' " Most complex commercial transactions are not simple, one-step transfers but multi-step arrangements beginning with an agreement and ending with a final closing, often months later. Section (d) is a recognition of this fact and represents a policy choice by Congress to treat alike both employers with binding agreements to withdraw before the new effective date and who do withdraw within the few months provided, and employers who in fact withdrew before the effective date, for purposes of calculating liability under MPPAA.[5] As summarized in the Senate Report on DEFRA, "[i]n the case of an employer who, on September 26, 1980, had a binding agreement to withdraw from a multiemployer plan, the effective date for withdrawal liability is changed to December 31, 1980." Joint Comm. General Explanation at 893.
 
 
 22
 The change of effective dates made by DEFRA impacts employers such as 888 through the withdrawal liability calculation provisions of MPPAA. The Act excludes from the calculation of the pro rata share of a plan's vested, unfunded benefits all contributions to a plan made before the Act's effective date. 29 U.S.C. Sec. 1397(a) provides, as amended by DEFRA Sec. 558:
 
 
 23
 For the purpose of determining the amount of unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan which occurs after September 25, 1980, and for the purpose of determining whether there has been a partial withdrawal after such date, the amount of contributions, and the number of contribution base units, of such employer properly allocable--
 
 
 24
 (1) to work performed under a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute before September 26, 1980, or
 
 
 25
 (2) to work performed at a facility at which all covered operations permanently ceased before September 26, 1980, or for which there was a permanent cessation of the obligation to contribute before that date,
 
 
 26
 shall not be taken into account.
 
 
 27
 (Emphasis added).[6] The key dates in Sec. 1397 were changed from the original April dates to the September date as shown by DEFRA's Sec. 558. Section 1397 does not reflect the special rule of Sec. 558(d) concerning the effective date for withdrawals made pursuant to binding agreements, as Sec. 558(b), which conforms ERISA to the provisions of DEFRA, only effects the change of date made by Sec. 558(a).
 
 V.
 
 28
 The sale of Barry Steel fits within the exclusion of 29 U.S.C. Sec. 1397(a). The parties do not dispute that there was a complete withdrawal from the Fund after September 25, 1980. 29 U.S.C. Sec. 1397 provides, for the purpose of determining the amount of the withdrawal liability assessed against an employer for a complete withdrawal from a plan after September 25, 1980, that the contribution history of an employer based on work performed at a facility at which covered operations permanently ceased before September 26, 1980 shall not be taken into account. While 888 did not permanently cease all covered operations at the Barry Steel Division before September 26, 1980, it did have a binding agreement to withdraw from the Fund for that facility before that date and did in fact withdraw before December 31, 1980. DEFRA's Sec. 558(d), as discussed above, directs that such transactions be treated as completed withdrawals before the September 26 effective date. Therefore, under Sec. 1397(a)(2), contributions made for the Barry Steel facility to the Fund by 888 shall not be taken into account in determining the withdrawal liability for 888. The Court is not making a determination of whether the sale of the Barry Steel facility amounted in itself to a partial withdrawal, as this is unnecessary under the facts of this case. Accordingly, we hold that the withdrawal liability assessment made against 888 is invalid to the extent it was calculated using the contribution history generated by 888's Barry Steel Division.
 
 
 29
 Since neither party disputes that a withdrawal liability is owed for 888's withdrawal from the Fund upon its sale of Intervale Steel, calculation of this assessment must proceed under the appropriate MPPAA provision, 29 U.S.C. Sec. 1391. From the record of the court below, there does not appear to be clear evidence as to what this assessment is. The Fund maintained below that it was entitled to an integrated assessment based on the contribution histories of both Barry and Intervale. It was only in its motion to reconsider filed with the district court asking the court to reconsider its grant of summary judgment in favor of 888 that the Fund specified an amount for withdrawal liability that the Fund alleged was calculated solely using Intervale Steel's contribution history. We find that 888 must be given the opportunity to dispute this amount. Accordingly, if the parties cannot agree on the amount suggested by the Fund, the matter should proceed to arbitration consistent with 29 U.S.C. Sec. 1401 as ordered by the district court.
 
 VI.
 
 30
 The district court awarded attorney's fees to the defendants pursuant to 29 U.S.C. Sec. 1451(e). That section provides that in actions brought to enforce the provisions of MPPAA: "the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party."
 
 
 31
 While the district court has discretion to award attorney fees under MPPAA, this discretion must be exercised within appropriate guidelines. Because MPPAA is a modification of ERISA, and because 29 U.S.C. Sec. 1451(e) contains similar language to that of the comparable ERISA attorney fees provision, 29 U.S.C. Sec. 1132(g), a district court should assess attorney fees under 29 U.S.C. Sec. 1451(e) following those guidelines which have been utilized by courts under 29 U.S.C. Sec. 1132(g). Sec'y of Dept. of Labor v. King, 775 F.2d 666, 669 (6th Cir.1985). See also Firestone Tire and Rubber Co. v. Neusser, 810 F.2d 550, 557 (6th Cir. Feb. 2, 1987); McKnight v. Southern Life and Health Insurance Co., 758 F.2d 1566, 1572 (11th Cir.1985); Sapper v. Lenco Blade, Inc., 704 F.2d 1069, 1073 (9th Cir.1983); Miles v. New York State Teamsters Conference, 698 F.2d 593, 602 n. 9 (2d Cir.), cert. denied, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980). These factors or guidelines are:
 
 
 32
 (1) The degree of the opposing party's culpability or bad faith;
 
 
 33
 (2) The ability of the opposing party to satisfy an award of attorney's fees;
 
 
 34
 (3) Whether an award of fees against the opposing party would deter others from acting in similar circumstances;
 
 
 35
 (4) Whether the party requesting fees sought to benefit all participants and beneficiaries of a multiemployer plan or to resolve a significant legal question; and
 
 
 36
 (5) The relative merits of the parties' position.
 
 
 37
 See Sec'y of Dept. of Labor v. King, 775 F.2d at 669.
 
 
 38
 When these factors are applied to this case it is apparent that the district court's attorney fee award cannot stand. While the Fund might well be able to afford an award of attorney fees in some amount, it is clear that the Fund displayed no culpability or bad faith. Moreover, the Fund has not engaged in any conduct which should be deterred. To the contrary, the Fund and its trustees have a fiduciary duty to act in a reasonable fashion to protect the Fund's assets. While the Fund has ultimately been unsuccessful in this litigation, the Fund, along with 888, took a colorable legal position in this uncertain area of the law. In fact, when the Fund first filed suit, prior to the passage of DEFRA, its efforts would likely have been successful.
 
 VII.
 
 39
 The judgment of the district court is AFFIRMED insofar as it granted summary judgment to the defendants. However, the district court's award of attorney's fees to 888 is REVERSED.
 
 
 40
 RALPH B. GUY, Circuit Judge, dissenting.
 
 
 41
 Because I view the determination of whether the sale of the Barry Steel Division constituted a partial withdrawal as central to the resolution of this case, I must respectfully dissent.
 
 
 42
 Section 558(d) of DEFRA mandates that the relevant date for substitution in Sec. 558(a)(1) shall be December 1, 1980, for all employers who had a "binding agreement to withdraw" from a plan by September 26, 1980. Since Sec. 558(d) acts only to change the applicable date in Sec. 558(a)(1), the focus of the effect of DEFRA's elimination of withdrawal liability is clearly Sec. 558(a)(1) which, by its express terms, voids an employer's withdrawal liability incurred "as a result of the complete or partial withdrawal of such employer ..." (emphasis added). Accordingly, it is clear that no withdrawal liability ever arises in the absence of a finding of either a complete or partial withdrawal from a multiemployer plan.
 
 
 43
 The Fund argues persuasively that holding all employers who engage in limited sales of single facilities or divisions liable for a partial withdrawal is contrary to the intent of Congress in enacting the MPPAA. Those amendments to ERISA were intended to impose partial withdrawal liability in two situations: first, where an employer divests itself of such a substantial portion of its business that there is a seventy percent (70%) decline in its contribution rate; and second, when an employer has attempted to close a plant or transfer all the work performed under one of its collective bargaining agreements, but continues to perform that same type of work (perhaps at another location) without any pension plan obligations. See the definition and criteria applicable to a partial withdrawal in 29 U.S.C. Sec. 1385.
 
 
 44
 Neither of those situations is present in this case. 888 underwent a contribution decline of roughly fifty percent (50%) by virtue of the sale of its Barry Steel Division, so the seventy percent (70%) figure of Sec. 1385(b)(1)(A) is not reached. Moreover, in selling one of its two steel divisions, 888 was not attempting to divest itself of its contribution obligation under that collective bargaining agreement while at the same time performing the same type of work elsewhere without the burden of making pension contributions for those employees. Sec. 1385(b)(2)(A)(i).
 
 
 45
 Since the majority makes no attempt to define when a partial withdrawal occurs, it is anomalous to void part of 888's "withdrawal" liability on the basis of a partial withdrawal having occurred. Moreover, 29 U.S.C. Sec. 1397(a), upon which the majority primarily relies, speaks explicitly of the computation of "unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan ..." (emphasis added). Clearly, a finding that an employer has incurred withdrawal liability in the first instance is essential before Sec. 558 of DEFRA can become operative to relieve the employer of this liability.
 
 
 46
 In actuality, the court has, by implication, held that the Barry Steel facility sale did constitute a partial withdrawal by finding that their agreement of sale constituted a partial cessation of 888's contribution obligation; i.e., they were no longer obligated to make contributions for employees at the Barry Steel facility. However, the fact that 888 had a "binding agreement to sell " the Barry facility is not conclusive of the question of whether that sale agreement also constituted a "binding agreement to withdraw " from the multiemployer pension plan. DEFRA Sec. 558(d). All sales are not automatically withdrawals. In my view, based on the applicable criteria for partial withdrawal set forth in 29 U.S.C. Sec. 1385, the sale of the Barry Steel facility by 888 did not constitute a partial withdrawal. Therefore, since 888 incurred no withdrawal liability as a result of that sale, Sec. 558 of DEFRA, whose acknowledged purpose is to relieve employers of withdrawal liability under specified circumstances, simply has no application to this case.[1]
 
 
 
 *
 The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee sitting by designation
 
 
 [1]
 888 was initially known as Barry Steel Corporation until it sold its Barry Steel Division and facility in 1980 to Powers Industries, Inc.'s designated subsidiary, Powers Steel Corporation. As this sale included the transfer of the name Barry Steel Corporation to Powers, Barry Steel Corporation changed its name to Intervale Steel Corporation, the name of its remaining Division. Intervale Steel Corporation then changed its name to 888 Corporation with the 1981 sale of the Intervale Steel Division and facility to Alain, Inc
 
 
 [2]
 A withdrawal liability is a contributing employer's proportionate share of the unfunded vested benefit liability existing in a multiemployer pension plan at the time of the employer's complete or partial cessation of obligation to contribute to the plan. 29 U.S.C. Secs. 1381(b), 1382, 1391(b)-(d). The liability may be assessed by any of the methods listed in 29 U.S.C. Sec. 1391, or by an alternative method adopted by a plan by plan amendment, subject to the approval of the Pension Benefit Guaranty Corporation. 29 U.S.C. Sec. 1391, 29 C.F.R. Sec. 2642.11 (1985). Unless otherwise provided for in the plan, the amount of unfunded vested benefits allocable to an employer is calculated by the "presumptive method" described in 29 U.S.C. Sec. 1391(b). 29 C.F.R. Sec. 2642.5 (1985). Under this method, withdrawal liability is calculated by multiplying the plan's aggregate unfunded benefit liability from all employers by the fraction made up of the sum of all contributions required to have been made by the withdrawing employer, divided by the sum of all contributions by all employers in the plan during the same time period. See Peick v. Pension Benefit Guaranty Corp., 724 F.2d 1247, 1256 (7th Cir.1983), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984)
 
 
 [3]
 Section 558 provides in relevant part:
 Elimination of Retroactive Application of Amendments Made by Multiemployer Pension Plan Amendments Act of 1980.
 (a) In general.--
 (1) Liability.--Any withdrawal liability incurred by an employer pursuant to part 1 of subtitle E of title IV of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1381 et seq.) as a result of the complete or partial withdrawal of such employer from a multiemployer plan before September 26, 1980, shall be void.
 (2) Refunds.--Any amounts paid by an employer to a plan sponsor as a result of such withdrawal liability shall be refunded by the plan sponsor to the employer with interest (in accordance with section 401(a)(2)), less a reasonable amount for administrative expenses incurred by the plan sponsor (other than legal expenses incurred with respect to the plan) in calculating, assessing, and refunding such amounts.
 ....
 (d) Special rule for certain binding agreements.--In the case of an employer who, on September 26, 1980, has a binding agreement to withdraw from a multiemployer plan, subsection (a)(1) shall be applied by substituting "December 31, 1980" for "September 26, 1980."
 Reprinted in "Historical Note" accompanying 29 U.S.C.A. Sec. 1381 (1985).
 
 
 [4]
 There are two types of employer withdrawal from multiemployer plans for which liability is assessed: complete and partial. Complete withdrawal, with exceptions for specific industries, is defined as follows: "For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer--(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. Sec. 1383(a). Partial withdrawal requires a more complicated definition but, in brief, is defined as follows:
 Except as otherwise provided in this section, there is a partial withdrawal by an employer from a plan on the last day of a plan year if for such plan year--(1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation.
 29 U.S.C. Sec. 1385(a).
 
 
 [5]
 The date of a complete withdrawal under MPPAA is, in brief, the date the obligation to contribute to the plan ceases or the date on which concerned operations cease. 29 U.S.C. Sec. 1383(e). A partial withdrawal is deemed to have occurred on the last day of a plan year if for that year there was a decline in contributions to the plan as defined by MPPAA or a partial cessation of the obligation to contribute to the plan. 29 U.S.C. Sec. 1385(a)
 
 
 [6]
 Section 1397 was explained on the floor of the Senate as follows:
 One feature of the Senate bill I am pleased has been retained in the bill before us is that withdrawal liability does not apply retroactively. This includes events such as, for example, a closing of a facility which occurred prior to April 29, 1980, the [original, pre-DEFRA] effective date of the withdrawal liability provisions.
 ....
 The withdrawal provisions will not apply retroactively in any way to [the] closing of a facility which occurred prior to April 29, 1980. Specifically, neither contributions nor base units attributable to a facility closed before April 29, 1980, will be taken into account for any purpose relating to the imposition or computation of withdrawal liability.
 I believe there is no question about this interpretation.
 
 
 [126]
 Cong.Rec. S23,284 (daily ed. Aug. 26, 1980) (remarks of Sen. Dole). The only two cases involving Sec. 1397, both decided prior to DEFRA's enactment, illustrate the significance of MPPAA's effective date. See Meatcutters Union Local No. 88 v. Del Monte Supermarkets, Inc., 565 F.Supp. at 29 (two of four stores closed before effective date of MPPAA were erroneously included in calculation of withdrawal liability assessed after remaining two stores closed); In re Food Fair, Inc., 14 B.R. 40, 43 (Bankr.S.D.N.Y.1981) (decline in contributions to plan before effective date of MPPAA held not to be taken into account for purpose of determining whether there has been a withdrawal)
 
 
 [1]
 Upon petition for rehearing by the Fund, the majority has clarified, in part III of its opinion, the reasons for permitting judicial review in the absence of prior statutorily-mandated arbitration in this case. Although the Fund expresses considerable distress over the failure to require arbitration here in view of the panel's statement in Marvin Hayes Lines Inc. v. Central States, etc., Pension Fund, 814 F.2d 297, 300 (6th Cir.1987), that courts were without jurisdiction over a dispute prior to arbitration in the absence of a constitutional challenge or a showing of irreparable injury, I see no inconsistency. The factual history of this case is unique; we are dealing with a legislatively-created defense which was enacted, fortuitously for 888, during the pendency of the Fund's collection suit. While the Fund argues that it offered to arbitrate the applicability of DEFRA subsequent to its passage, a review of the record reveals that that "offer" was contained in its response to 888's motion for summary judgment filed with the district court. Considering the events which had already transpired and the procedural posture of the case, it was not error for the district court to decide the case as opposed to ordering arbitration at that late date. Such action, given the unusual factual circumstances of this case, does not derogate the usual rule in favor of arbitration applicable to the vast majority of cases brought under ERISA or the MPPAA